Custom Hair Designs by Sandy et al versus Central Payment. Okay, Mr. Parrish. Thank you. May it please the court, Ashley Parrish for Appellant Central Payment Company. This case is based on the claim that Central Payment charged its merchants a variety of fees, different fees, for credit card processing services that were not authorized by the merchants contracts. The case is not suitable for class action treatment because the contracts are not uniform. The agreed-upon fees and the structure of those fees differed from merchant to merchant, and the merits of any individual merchant's claim cannot be resolved without an individualized inquiry into the terms of the merchants contracts and the negotiations they had with the company. Counsel, let me interrupt you, and I don't mean this as hostile as it sounds, but I noticed that in your brief, both the main brief and reply brief, you did not address the RICO point, and particularly what's pleaded in the First Amendment class action complaint about your clients, about their relationship with the FTC, and you know all the allegations. I won't spell them out. Does the fact that we have the RICO allegation here make this more like the Tyson case, where the liability side of the case is fine for class action and the only issue is the damages side of it? Yeah, so Your Honor, the answer to that is no, and I would refer Your Honor to page 29 of our reply brief where we do address the RICO issue, but Your Honor, what I would say there is that in order to establish a RICO claim, you still have to show reliance, not first-person reliance, but you do need to show reliance, and you also have to show some form of causation that the injuries were a result of the scheme. We don't have either of those here, and the reason is is on reliance, there's no allegation that can show reliance by a third party, so they have to show first-party reliance, but you can't look at determine that without understanding the individual terms of the individual contracts, and so Your Honor, if you take a case that they rely on extensively when they talk about their RICO cases, they cite to the Second Circuit's decision in the U.S. Food Services, and you'll know from that decision what was key there was that one, it was only a single fee, it wasn't this grouping of multiple different variations of four fees. Second, it was a situation where there was only one representation that was uniform across the class, which we don't have here because of the ways that the contracts were negotiated. They argue there's a billing notice, but the billing notice came after the individual contracts were negotiated, so you can't show reliance on that without understanding what the contracts were, and third, Your Honor, perhaps most significantly, the Second Circuit put dispositive weight on the fact that in that case there was no evidence of variations between the parties' contracts. Of course, here, even the name plaintiffs had variations beyond the contract, so without a uniform contract, you can't do that, and Your Honor, you'll see that the Second Circuit distinguishes the Fifth Circuit's case in the So, Your Honor, the reason we obviously addressed the RICO claim, but the reason we didn't focus on it is because the RICO claim is really just a tagalong to the contract and broader fraud claims that are both not suitable, and there's no RICO exception to certifying class action. Well, counsel, at this point, how do we know it's a tagalong at this point in the litigation? Well, Your Honor, what you have to ask is you have to do a couple things. You first have to take a look at the class as it was certified by the district court, and you will notice that what's happened in their response brief is that they are running away from that class definition in a number of ways, making concessions of things that are not in the class, but you first take a look at what the class and how it's been certified. Your Honor, I would take a look at how they describe their fraud claim, so if you take a look at page 27 of their response brief, this is them describing their RICO fraud claim, and they say... Hold on one second. Let me get to page 27. Absolutely, Your Honor. Thank you. I feel a little better about it then. I will actually read it to you, Your Honor, if that helps. No, no, I don't, but page 27 of this red brief is what you're telling me, right? Yes, Your Honor, and you'll see... Okay, proceed. Right, page 27, it says, and this is in the first full paragraph, as already noted, CPA generally overbuild merchants in two ways. One, by imposing rate increases without contractual authority or any other illegitimate fees accompanied by deceptive notices, and Your Honor, you notice the key in there is that their argument as to why it's a RICO violation of fraud is because it's without contractual authority. Of course, whether it's with contractual authority goes back to the individualized inquiry as to what the individual merchants agreed to. They also talk about legitimate basis, but Your Honor, the legitimate basis under the case law and how they pled their case also collapses down to the question of what did the parties actually agree to in their individual contracts. Your Honor, what I said I was going to try to do today, and I appreciate Your Honor's questions because it's taken me through some of those arguments, but what I really wanted to do was three things, which was first start off and emphasize the variations and why this case cannot be certified as a class. Second, Your Honor, really turn to this question, which is that they've shifted their theory, but on appeal what they try to say is that because this is an overbilling theory that they can get around those problems, and I'll explain why that's wrong, and then lastly, I just make the point for the court that even if you disagree with us on those first two points, at a minimum, the district court's analysis here is not rigorous enough to allow you to affirm, so you at least should be sent back down for further analysis. But Your Honor, going to the first point, which I really think is helpful, is you can take a look at the class definition that's either in the addendum, page 3, footnote 1, which is the court's opinion, or page 16 of our opening brief where we reproduce it, but you'll see that there's four different types of fees from January 2010 to the present. That's what's known as the TSIS network fee, which are the processing fees reflecting costs imposed by the credit card companies. There's the PCI non-compliance fees, which is the fees that get paid when you don't comply with certain security standards that are imposed by the credit card industry. There are the discount rates, which they said were increased above the agreed rates, and then there's a higher rate tiers, then there are arguments that people were shifted between tiers. What's key to look at is not only the variety of all the different types of fees that are put into that, but the structure of each of those fees vary. There is no one TSIS network fee, PCI non-compliance fee, discount rate, or higher rate. Each of those fees had a different structure for the different amount that was charged depending on their individualized circumstances. That means what types of credit cards they were processing, how those credit cards were processed, and what the mix was for them. Our basic point to the court is that you cannot know whether all of those or any of those fees were permissible without looking at each merchant's contract, understanding what was agreed to by that merchant, and what amounts were charged under what particular circumstances. And your honors, just to give you a thumbnail sketch of the evidence that was presented below, you can take a look at the addendum on page 36 with the declaration from Mr. Ratner that goes through this in more detail. But what you'll see there is that there's 200,000 alleged class members. Looking at a sample of 200 contracts, we found at least 28 different templates. There's 10,000 strong sales force that's merchants. And the key terms relating to what the discounts would be, what fees would apply, whether it would be a tier or whether it would be a cost plus of contract, were negotiated and filled in by hand. And you can see that on page 11 of our opening brief where we give you a reproduction of what some of the contracts look like. And you can also look at an addendum 50 to see that as well. My point is, your honors, you cannot know whether a merchant should have been charged a TSIS network fee or a PCI non-compliance fee without understanding whether they agreed to pay those fees in the contract. Well, counsel, tell me how this is different than a secured... By the way, has there been a United States Supreme Court case on RICO classes? Your honor, I wish I knew that off the top of my head. I don't think there's one that's directly... Yeah, yeah. We don't think there's one either. Feel free to do a 28J if you do find one. But we didn't find a class action RICO case at all. Now, so the nearest thing I think is securities fraud. All kinds of security fraud cases. And in those cases, everybody's defrauded a little bit differently. As you know, you have to fill out these long, god-awful forms. You have to say who you dealt with and who the... I don't have to tell you. We're aware. How is this just not like a standard securities fraud case? So, your honor, let me answer that in a few ways. One, about why it's different, and second, why the other side hasn't relied on that. I think it'd be more helpful to take a look at the two cases they do rely on because it's really telling the differences. So, first, your honor, as you know in the securities context, there are principles relating to fraud on the market as a whole that do not apply in this context. And you... So that's an important distinction, which is why I think the other side really focuses on the two cases they cite. There's the Second Circuit case we talked about, U.S. Food Services, and then there's the Fifth Circuit TORS case. Now, remember, in the U.S. Food Services case, again, as I made clear, the key three points of difference is it's only one fee. We all know what the fee is. There wasn't any variation in the representations that were materially relied upon. And then lastly, your honor, it was... There was no evidence to show variations in contracts. In the Fifth Circuit case, what we're talking about is a Ponzi scheme, and the whole scheme was alleged to be fraud. There was nothing about it that was alleged to be appropriate. And you can see the differences between the dissent and the majority was whether, actually, the people knew that it was a Ponzi scheme. Well, is your second case that you just mentioned, and I'm sorry I didn't get it, but is your second case like this case once you look only at the RICO allegations? No, your honor, because, again, you have to understand that the RICO allegations require an element of that without looking at an individualized basis here. They don't even argue reliance on a class-wide basis because they have to, in order to do that, show that someone relied, and you can only do that through first-person reliance here. They also haven't shown causation. Your honor, I see I'm down to four minutes, and I would like to reserve my time for rebuttal, but I also would like to answer more questions if you'd like to at this point. Sure. Let's check the other judges. I don't see any questions from them. So you're saved for honor. Okay, and Mr. Hudson. You're muted, Mr. Hudson, so unmute. Thank you, your honor. May it please the court. Judge Benton, if I could, I'd like to start with your question because I think you got to the heart of the issue in this case, which is the RICO claim, and I believe that you are right. There isn't a Supreme Court case that's addressed the certification of a RICO claim, but there is a Supreme Court case that's critically important to this issue, which is Bridge, and in Bridge, what the Supreme Court said is that you do not have to have an affirmative misrepresentation that's relied on in order for there to be a RICO claim. The key is the gravamen of the offense is the scheme. Now, the cases that are most applicable here, and you need to tell me because I didn't see a B, I heard a B. What was the case you just told us about? Bridge, B-R-I-D-G-E, it's a unanimous. Is it in your brief? It is in our brief, yes. Okay, what's the first name of the other party? I'm trying to find it in your index. If it's too much trouble, don't worry, Mr. Parrish can tell us. That was giving you So, the point of Bridge, and I praise Bridge because it's the foundation of the Second Circuit, the Eleventh Circuit, the Fourth Circuit, and the Fifth Circuit's cases, excuse me, the Fifth Circuit, the Second Circuit, the Eleventh Circuit, and the Tenth Circuit's cases that have decided this issue, which is in a RICO claim, where you have allegations of a fraud scheme, and it's a concealed scheme, then how do you prove reliance? And all of those courts have held that an inference of reliance is reasonable. And once you understand that this scheme is not based on what's in the contracts, it's what's based on what's not in the contracts. And so, the key point on the RICO claim, and the reason why every circuit to have decided this issue, and just so this court knows, it's the Fifth Circuit court to have granted a Rule 23-F appeal on a RICO claim of this nature, and the other four circuits have all affirmed the certification. And they've affirmed the certification on the reasoning in the Second Circuit's case in food service, and the Eleventh Circuit's case in clay. And in clay, for example, was a massive case by all of the HMOs against all of the doctors in the country. And the theory was that that's literally the words that the Eleventh Circuit used. And so, the idea that somehow this is restricted to some narrow set, it's the scheme that is the key, and that's critically important. And at trial, we're going to have to prove that the defendant, CPEI, hatched the scheme. But if we do so... Okay, do you concede, though, that you're going to have to look at the contract at least to figure out these fees? I've got your class definition here. Right? So, on damages and to figure out these different fees, you're going to have to look at the contracts, right? We will have to look at the contracts, and we'll have to look at CPEI's billing data to see what they actually charge. And if you look at our class definition, because one of the things that the defendant is trying to contend is that we've changed the class definition. And I want to be warning in Walmart and in Comcast that don't just plead these claims, prove them. And so, we put forth two expert reports with these class definitions in them. And the class definition is defined by the scheme. So, the first two categories or prongs of the class definition is the TSSN fee and the PCI noncompliance fee. And those are two fees. They might as well be the two fees that the Hyman brothers made up. Because our contention is that... The contract won't say that, I bet. And that's the scheme. The contract will not say that, and that's the scheme. So, at trial, we're going to have to prove that these are two fees that they made up to extract extra profits, but that were disguised as pass-through fees. And that's the scheme. This is what these guys did. And that they used CPAY, this company, and they were telling small businesses that they were charging these fees because the credit card companies were imposing them. Okay, those two sound like you could look at something and see if they're there. But what about contractual credit card discount rates increased above their contractual rate? What do you think about that one? That one sounds pretty amorphous, trying to figure it out, but look at the contracts. So, it may seem amorphous, but when you put it in the context of the scheme, what we're talking about is the billing statements that were sent to customers, which are... This would probably be very helpful. If you look at the joint appendix at 1898 through 1908, we've cataloged the representations. And when you see that, those are the statements that are made. So, these definitions of the class are tied specifically to the categories of fees where CPAY increased rates. And so, here, what we've got is we've got, over time, CPAY sending billing notices to customers in which they're indicating that the discount rate has been increased, or that the thesis rate had been increased, or they did what's called a tier from a lower rate to a higher rate. And they told the customers in each of these instances, we're doing this because of changes in the credit card industry, or we're doing this because the credit card companies have modified the interchange rates. In reality, and we put a couple of really good examples in our addendum, you can see that in the internal emails that, in fact, they were doing this was because of the... You know, CPAY was doing this just to boost their own profits, that they're not substantiated. And in this case, there is no evidence in the record that these were legitimate fees. And so the point being, if we go back to why should a class be certified, the point is, Judge Benton, it is exactly like Tyson. This RICO claim is exactly like Tyson. It's exactly like a securities fraud case in the sense that... You're aware of Chief Justice Roberts' opinion. I know it doesn't control the case. I think there are only two or three justices on it, but they claim that the class will disintegrate at the damages stage in Tyson. So does that happen to your class? Even if you survived this stage of it, does it disintegrate at damages? It does not because Chief Justice Roberts was concerned with an allocation issue. So in that case, as this court knows, and I'm sure Judge Benton, you're aware, or may recall, the case went to trial with the general verdict form. And so then the jury did not accept the donning and doffing estimates by the plaintiff's expert. Instead, they used a lower statistical sample. And Judge Benton, you could probably explain it much better than I can. So then it became an allocation issue. Are there uninjured class members in the class or are there not? And Chief Justice Roberts, although he affirmed the opinion and said that the class should not be decertified, he wrote separately and concurred being concerned that the case, they may not be able to allocate the damages because it was a general verdict form. So how do we figure out who was injured and who wasn't? Well, subsequent to that, the parties actually did figure out how to allocate the issue and the issue went away. So here, if there are concerns about allocations, for example, one thing we could do is create a special verdict form. And so we could have each one of these categories of fees that we're talking about, and we could have yes or no. And so the issue is, is there a scheme? And then what are the categories of fees in the scheme? And so if there's a concern about an allocation issue, that would be one way to deal with it. The key point here, which is different than in Tyson, in Tyson, as you know, under Mount Clemens, they had to use statistical sampling in order to be They didn't keep track of the donning and doffing. Well, here, this is an overbilling scheme where the company does have the records. And so we know down to the penny of what this company charged these class members, and we've hired an expert. And you'll see, and again, heeding the Supreme Court's warning, we didn't just rest on our pleadings. We actually went and hired an expert, gave him the data, and he's gone and calculated and showed that he can calculate the damages to So when we get to trial, we will have each one of these categories of charges, and he can then calculate how much damages exist for each category. If the jury, for some reason, said that's a legitimate charge, that's not an illegitimate charge, that's not part of the scheme, then we would be able to reduce the amount of the jury verdict in that way. So actually, this case is much more amenable to one class trial. We don't need bifurcation. You don't need any of the typical remedies or procedures that district courts often do in this case, given the fact that it's an overbilling scheme. But obviously, for purposes of our case right now, the question is, are there common answers that will drive resolution of this case? And the answer is no question. If you look at the other four cases, NREA U.S. Food Service, that case settled after the class certification was affirmed. CGC Holding was another example. That case recently went to trial, and there was a manageable RICO trial. The Torres case in the Fifth Circuit, which we cite in our briefs, settled after class certification. And so the examples where this issue has come up with a RICO claim show that there are common issues because it really derives from the common scheme, and that's the heart of the case. Counsel, what's your closest RICO case? Did I cut you off, Judge Grouse? No, you go ahead. No, answer me quickly so we definitely get to Judge Grouse. But what is your closest RICO class case? There's no Supreme Court cases, we all think. What's the closest RICO class case, to give us any guidance here? NREA U.S. Food Service. Second Circuit opinion. Is that a RICO case? It's a RICO case. It's a RICO case. It's a contract case. Yes, thank you. I am familiar with that. Judge Grouse. Okay, so the appellant is arguing that, and I'm turning to the rigor of analysis issue here, and they're arguing that, well, how can you possibly clear this hurdle of having a rigorous analysis in light of Harris versus Union Pacific? And so I'd like to have you tell me how this case is distinguishable from Harris. Sure. In Harris versus Union Pacific, this court reached the merits and went and looked at the nature of the claim and the plaintiff's theory of the case. And in this case, as Judge Erickson knows, the court concluded that the district court erred because the court did not analyze a business necessity defense in that case. And so it abused its discretion when it applied the law by not defense. And there were 650 different jobs in that case, and the ADA claimed that this court found that it would require individual determinations as to each one of those jobs. Here, by contrast, when this court goes and looks at the nature of the claim and looks at the RICO claim and the fraudulent concealment claim and the breach of fiduciary duty claim, you're not going to encounter those same problems because they don't exist in this case. The district court, I think the opposing counsel and CPEI, they greatly exaggerate the lack of rigor by the district court because if you look at the district court's opinion, in effect, what the district court did was agreed to apply the logic and the reasoning in food service and clay. And if you look at the predominant section, they characterize it as just one short paragraph. But if you look at that section and you look at the language that the district court used, he's making factual findings. It's on page 16 of his decision. And he's saying the legal theories further, the common issues predominate over the individual issues. The important evidence will be ascertained from CPEI's files, testimony, and expert reports. The legal theories all turn on the same evidence. Assuming the general allegations are true, the plaintiffs in the case have made a prima facie case based on the common evidence. The only possible variations that the court sees at this time is the computation of any damages, which is Judge Benton's issue. However, and then he goes on and explains why in this type of case, that's not an issue, citing, excuse me, however, in this type of case. Yeah, the citing is not good because it's a 2004 pre-Tyson case. It is, but it's consistent with Tyson. And so at that point in time, this is an overbilling case that involves, you know, using data to analyze overbilling. And so he cites to clay. And so the point is, is it, what's doing, excuse me. I think Judge Erickson had a question. I was just looking at the thing is, is there seems to be other issues that have been identified that, that may be individualized and predominate. You know, we've got the statute of limitations question. I mean, he's defined his class going back 10 years. Something 10 years old is beyond the statute of limitations, I think in every state. And so that's an issue. And of course, Parrish has argued about the varied terms of the contracts, the varied negotiations, what's in, what's out. And I mean, I guess that this RICO common scheme thing is supposed to take care of like all those things. Is that generally your argument? But I think as to, I think that the nature of the scheme and the fraud does address the small business merchant in this class was aware of this scheme. And that's critically important. I mean, in every case involving an issue like this, where there is no evidence, you have a concealed scheme, then it's clear that the statute of limitations wouldn't preclude it. But even if there's still a discovery component to it, it starts to accrue once somebody discovers the scheme. Yes. Yes, Judge. I completely agree with that. And, and I, and, or if I may go, I see I'm out of time, but if I could just... No, no. You answer as long as Judge Erickson wants to talk with you. Go ahead. Thank you. Yeah. In this case, yes, you're right. The clock starts when they discover the scheme. We discovered the scheme in the middle of discovery in this case. That's when we found the internal emails. We found the documents that give rise to the RICO claim. That's why this case was initially filed as a breach of contract case. And then once we reviewed, you know, thousands and thousands of pages of documents, that's when we started to put this scheme together. And that's when we filed the amended complaint. And that's when we had expert reports. And so you're, you're absolutely right, Judge Erickson. If there was, if there was evidence that the scheme was not concealed, but that they hadn't taken steps to conceal the scheme, statute of limitations may be a problem. In this case, it's, it is not. Judge Benton, if I might, could I just go ahead and conclude? One sentence. I would just say as, as Amicus Main Street Alliance explains, in this case, the class action may only, it is not only the superior way to fairly and efficiently adjudicate this controversy, it's likely the only way for more than 160,000 small businesses. Thank you, Counselor. Thank you. Okay. Mr. Parrish, rebuttal. Yes. Thank you, Your Honors. What I'd like to do on rebuttal is three points. First, let me address the RICO point. Judge Erickson, you are absolutely correct. They're hanging, hanging everything on RICO. Judge Benton, you asked them what their best case was. They said, in Ray US Food Services, of course, you can see the differences there is the contracts there were uniform. They're not uniform here. The contracts there, there was no evidence of individual negotiation. There is evidence here and there were not multiple fees. It was just one fee. This case is much more like Sandwich, which is another RICO case that talks specifically about when you have that lack of uniformity, you can't go forward. Why? Because you need to prove reliance. The Bridge case talks about it doesn't have to be first person, but at least it has to be some reliance and you have to show causation. They can't do that here. The second point, Judge Benton, goes to your point. We had a big discussion about damages, but of course, we don't get to damages until we get past injury. Their whole argument is that overbilling is essentially a sham. That could mean one of two things, either that you shouldn't have charged it at all, in which case, if that's true, you have to look at the contracts to see whether they agreed to the fee, or they could be arguing that the charge was too much relative to what they agreed to, in which case, you have to understand what they agreed to. The way the experts for the other side has suggested this is that we take a look at the first month billing statement and any fluctuation in fee after that is an improper increase. The whole point that we set out in our briefs is that the agreement as to what the fees would look like, many of them included fluctuations that would base on like you would agree to a fluctuating mortgage rate. They agreed to the fluctuations in fees based on what was passed through from the card company. You can't understand whether the fee went up and down without looking at the contracts to understand whether the cost charged were proper or not. That takes us to the last question, Judge Gratz, your point about the rigorous analysis. First, I'd urge the court to look at pages 42, footnote 12, and 43, footnote 13 of the other side brief. Both of those are concessions that the class as certified is not what they're defending in this court. They say it doesn't include all types of tier shifts, and they now say that those who agree to a certain type of fee are not in the class. That appears nowhere in the district court's decision. The problem is that the evidence in the record is extensive. It's not like he says. There's lots of That leads me to my last point. Your honors, in the Harris case, from my reading of the decision, did two things. One is you said you have to do the type of rigorous analysis that is required so the court of appeals can understand whether you've gone through the process to take the exceptional step of taking an individualized case and turning it into a class action. That was not done here. But more than that, in your Harris decision, you did not just remand because that wouldn't have gotten the parties anywhere. What you did is you looked at the arguments that you presented and provided important guidance to the district court as to how to think about the case on remand. Your honors, our basic submission in our briefs and today is we would be very grateful for the court to provide some guidance on these issues that the other side is confused so much. It is true that in rare circumstances, contract claims can be certified. It is true in rare circumstances as this court's decision in St. Jude recognized fraud cases can be certified, but they cannot be certified when issues of material reliance vary from party to party and when the contracts are not uniform and the representations are not uniform and the underlying fee structure is not uniform. That's what we have in this case. Your honor, we'd be very grateful and we'd urge the court to one, reverse the district court and send it back down with instructions that that type of case, the one that has been presented and argued in this court, cannot be certified as a class action and to provide the guidance that this district court would appreciate. Thank you very much for your time. We're very grateful for the court's attention. Okay, thank you counsel for the argument. Case number 20-1677 is submitted for decision by the court and that concludes.